# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE: STEPHEN THOMAS YELVERTON,** | |
| Debtor. | |
| **STEPHEN THOMAS YELVERTON** | |
| Appellant, | |
| v. | Case No. 1:12-cv-01539 (CRC) |
| **WENDELL W. WEBSTER, et al.,** | Bankruptcy No. 09-00414 |
| Appellees. | |
| **STEPHEN THOMAS YELVERTON,** | |
| Appellant, | |
| v. | Case No. 1:13-cv-00454 (CRC) |
| **WENDELL W. WEBSTER, et al.,** | Bankruptcy No. 09-00414 |
| Appellees. | |
| **STEPHEN THOMAS YELVERTON,** | |
| Appellant, | |
| v. | Case No. 1:13-cv-01544 (CRC) |
| **WENDELL W. WEBSTER, et al.,** | Bankruptcy No. 09-00414 |
| Appellees. | |

## <u>MEMORANDUM OPINION</u>

In these three related cases, Debtor Stephen Thomas Yelverton has appealed a series of orders of the bankruptcy court approving a settlement agreement between the bankruptcy Trustee and Yelverton's two sisters, Phyllis Edmundson and Deborah Marm, and denying Yelverton's requests to exempt his stock in the family's poultry farm from the bankruptcy estate. Because the

Trustee adequately justified the terms of the settlement and Yelverton improperly sought to exempt property, the Court affirms each of the bankruptcy court's orders.

## I.      Background

Yelverton filed a Chapter 11 Voluntary Petition for bankruptcy in May 2009.  In re Yelverton, 9-414 ("Bankruptcy Proceeding") Dkt. 1 (Bankr. D.C. May 14, 2009).  After Yelverton proposed five plans for the reorganization of his debts, the bankruptcy court in 2010 converted the case to a Chapter 7 liquidation and appointed Wendell W. Webster as trustee.  Id. Dkts. 336, 1,323. Yelverton's initial bankruptcy schedule listed, as his solely-owned property, 1,333 shares of Yelverton Farms, Ltd., a closely-held North Carolina corporation.  Id. Dkt. 22.

In July 2009, Yelverton filed suit in the Eastern District of North Carolina against Yelverton Farms and his two sisters, Edmundson and Marm, the majority stock holders.  The suit alleged breach of contract and malicious interference with a contract and sought judicial dissolution of Yelverton Farms or a mandatory buyout, as well as $3,000,000 in damages.  Webster v. Yelverton Farms, Ltd., 9-331, Dkt. 3 (E.D.N.C. July 29, 2009).  In March 2011, the district court entered an order finding that Yelverton lacked standing to bring the case because his claims were the property of the bankruptcy estate and directed the Trustee to file a notice of substitution, which he did on March 15, 2011.  Id. Dkts. 120, 122.[1]

Yelverton also filed two adversary proceedings in bankruptcy court in January 2010.  The first sought a transfer of 1,333 shares of stock in Yelverton Farms from Edmundson, her husband, and the company.  Webster v. Edmundson, 10-10003, Dkt. 1 (Bankr. D.C. Jan. 14, 2010).[2]  The

---

[1] Yelverton later filed two additional cases regarding Yelverton Farms—Yelverton v. Yelverton Farms, 14-365 (E.D.N.C.) and Yelverton v. Edmundson, et al., 13-1543 (N.C. Sup. Ct, Wayne Cnty.)—and he has filed two new adversarial matters in bankruptcy court this year.  All of these cases assert the same facts and law as his prior cases.

[2] While the parties do not dispute that Yelverton is entitled to 1,333 shares of Yelverton Farms'

Trustee was substituted as plaintiff in December 2010.  Id. Dkt. 57.  The second proceeding sought to prevent Marm and her husband from selling a 276-acre tract of land in Wayne County, North Carolina.  Yelverton v. Marm, 10-10004, Dkt. 1 (Bankr. D.C. Jan 14, 2010).  The bankruptcy court granted summary judgment against Yelverton, id. Dkt. 36; this Court upheld that decision, In re Yelverton, 10-1494, Dkt. 10 (D.D.C. Apr. 5, 2011); and the D.C. Circuit stayed review of that decision pending approval by this Court of the settlement agreement discussed below, id. Dkt. 21.

The Trustee then entered into negotiations with Edmundson, Marm, their spouses, and Yelverton Farms on behalf of the bankruptcy estate.  The parties reached a settlement agreement on March 23, 2012, dismissing all claims brought by Yelverton and transferring the bankruptcy estate's 1,333 shares of Yelverton Farms to Edmundson and Marm in exchange for a lump sum payment of $110,000.  Bankruptcy Proceeding Dkt. 451 Ex. 1.  The Trustee moved for approval of the settlement by the bankruptcy court on May 4, 2012.  Id. Dkt. 451.

The bankruptcy court subsequently held an evidentiary hearing in which the Trustee explained his determination that the $110,000 settlement payment for Yelverton's share of the company and his litigation claims was in the best interests of the bankruptcy estate and its creditors because Yelverton had overvalued both the stock and claims.  Id. Dkt. 546 at 30:14–31:2.  The Trustee relied on a North Carolina appraiser's informal estimate that the business would be worth no more than $400,000 because Yelverton Farms owned the swine facility it operated but only leased the underlying land from Edmundson.  Id. at 35:9–15; 39:9–40:1.  Yelverton contested that valuation based on a 2003 appraisal that valued the business at $900,000.  The Trustee discounted Yelverton's appraisal because the appraiser was specifically instructed not to consider the lease in valuing the business and instead valued the land and business together.  Id. at 36:7–37:9.  The

_____

stock, Edmundson and Marm hold the physical stock certificates.  Thus, settling Yelverton's litigation claims, as discussed below, also resolves his ownership rights in the company.

Trustee did not order a formal appraisal because, in his view, the costs would outweigh any potential benefit.  Id. at 40:2–10.  Although Yelverton claimed his stock amounted to a one-third ownership interest in the company, the Trustee found Yelverton's ownership interest to be in dispute because Yelverton Farm's tax records all reflected that Yelverton only owned a one-fourth interest after an apparently valid stock issuance by the company.  Id. at 124:2–21.  The Trustee also explained that he obtained counsel in North Carolina in order to determine the probability of success in Yelverton's litigation efforts against Edmundson, Marm, and Yelverton Farms.  Id. at 37:14–38:7.  The North Carolina counsel opined that discovery alone on Yelverton's common law claims could cost as much as $25,000, while the bankruptcy estate had no cash on hand to pursue litigation.  Id. at 40:11–41:5.  Moreover, the Trustee determined that the value of Yelverton's various litigation claims aside from recovering his stock was minimal because they lacked evidentiary support and were likely barred by a number of defenses.  Id. at 41:16–46:6.  On the basis of the testimony at the evidentiary hearing, the bankruptcy court approved the settlement agreement the next day.  Id. Dkt 477.

Yelverton moved to have the Trustee abandon certain of the claims in the North Carolina District Court case on June 3, 2012, and amended the motion on July 5, 2012.  Id. Dkts. 481, 484.  The bankruptcy court rejected the motion on August 7, 2012.  Id. Dkt. 505.  Yelverton filed a motion to vacate the order approving the settlement on July 3, 2012, which the bankruptcy court rejected on August 8, 2012.  Id. Dkts. 483, 506.  Yelverton then filed a motion for relief from judgment, also seeking to reverse the order approving the settlement, on July 14, 2013, which the bankruptcy court denied on August 8, 2013.  Id. Dkts. 666, 682.  He filed a motion to vacate *that* order on August 22, 2013, which was denied August 27, 2013, and followed that up with a motion to vacate the August 27 order, which was denied September 4, 2013.  Id. Dkts. 693, 696, 702, 704.

Over three years after he initially filed for bankruptcy, Yelverton sought in July 2012 to amend his bankruptcy schedules to claim an exemption for his stock in Yelverton Farms, now claiming that his stock and litigation claims were held between his former spouse, Alexandria Nicole Senyi de Nagy-Unyom, and himself as tenants by the entireties. Id. Dkt. 487. Yelverton filed another supplemental amended schedule in August 2012, claiming the stock was also exempt under the wild card exemption and as compensation for lost future earnings. Id. Dkt. 519. He then filed a motion for summary judgment as to his claimed exemptions on November 26, 2012, and the Trustee filed a cross-motion on December 7, 2012. Id. Dkts. 556, 558

The bankruptcy court held a hearing on the parties' cross motions for summary judgment regarding Yelverton's claimed exemptions on January 8, 2013. Id. Dkt. 576. Yelverton then filed three motions for leave to submit supplemental materials regarding the exemptions on January 14, 16, and 25, 2013 respectively. Id. Dkts. 584, 585, 586. On January 30, 2013, the bankruptcy court rebuffed Yelverton's claims that his stock was exempt, allowed Yelverton an exemption of $11,200 in the proceeds of the global settlement, and granted Yelverton's motions to file additional documents. Id. Dkts. 588, 589. Yelverton filed a motion to alter the bankruptcy court's decision on February 13, 2013, which was denied on February 19, 2013. Id. Dkts. 595, 596.

Given the numbing litigation history outlined above, it will come as no surprise that Yelverton has not hesitated to appeal orders in his bankruptcy proceeding to this Court. He has done so 14 times. This opinion addresses three outstanding appeals. *First*, in September 2012, Yelverton appealed bankruptcy court orders (1) approving the settlement between the Trustee, Edmundson, and Marm; (2) denying Yelverton's motion for relief from that order, and (3) denying Yelverton's amended motion to compel the Trustee to abandon Yelverton's litigation claims. In re Yelverton ("Yelverton I"), 12-1539, Dkt. 1 (D.D.C. Sep. 17, 2012). *Second*, in April 2012, Yelverton filed an appeal challenging the bankruptcy court's orders (1) denying his motions to have

the Yelverton Farms stock exempted; (2) granting his motions to submit supplemental documents in support of his claimed exemptions—but explaining why they added nothing to the bankruptcy court's decision; (3) denying his motion to amend or alter the bankruptcy court's order denying the exemptions; and (4) denying his motion for leave to appeal the bankruptcy court's orders without paying filing fees. In re Yelverton ("Yelverton II"), 13-454, Dkt. 1 (D.D.C. Apr. 5, 2013). *Third*, in October 2013, Yelverton appealed bankruptcy court orders that (1) denied his motion for relief from the order approving the settlement—despite his already having appealed that order in his September 2012 appeal; (2) denied his motion to vacate the bankruptcy court order denying his motion for relief; and (3) denied his motion to vacate the order denying his motion to vacate the order denying his motion for relief. In re Yelverton ("Yelverton III"), 13-1544, Dkt. 1 (D.D.C. Oct. 8, 2013).

## II.     Standard of Review

United States District Courts have jurisdiction over appeals of bankruptcy court decisions. 28 U.S.C. § 158(a). Orders in bankruptcy cases may be immediately appealed as final orders if they dispose of discrete disputes within the larger case. In re St. Charles Preservation Investors, Ltd., 112 B.R. 469, 471 (D.D.C. 1990). On appeal from a bankruptcy court, a district court may affirm, modify, or reverse a bankruptcy court's judgment, or remand with instructions for further proceedings. Fed. R. Bankr. P. 8013; In re Johnson, 236 B.R. 510, 518 (D.D.C. 1999). A district court shall not set aside findings of fact unless they are clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Fed. R. Bankr. P. 8013; Johnson, 236 B.R. at 518. "The burden of proof is on the party that seeks to reverse the Bankruptcy Court's holding. That party must show that the court's holding was clearly erroneous as to the assessment of the facts or erroneous in its interpretation of the law and not simply that another conclusion could have been reached." Johnson, 236 B.R. at 518 (citing

Anderson v. Bessemer City, 470 U.S. 564, 573–74 (1985)).  "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948).  Courts should review questions concerning the application of the controlling law *de novo* on appeal.  Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990).

### III.    Analysis

Yelverton makes numerous related arguments in his three briefs on appeal, which the Court will address in turn.  The Court will not consider arguments that Yelverton raises for the first time in his reply briefs or in supplemental filings made after briefing concluded.  See Taitz v. Obama, 754 F. Supp. 2d 57, 61–62 (D.D.C. 2010) ("Courts ordinarily decline to consider arguments that are raised for the first time in a reply to an opposition.") (citing Pub. Citizen Health Research Grp. v. Nat'l Institutes of Health, 209 F. Supp. 2d 37, 43–44 (D.D.C. 2002)).

### A.   Yelverton I

In Yelverton I, Yelverton seeks review of bankruptcy court orders approving the settlement agreement between Edmundson, Marm, Yelverton Farms, and the Trustee.  A bankruptcy court may approve a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019(a).  "A bankruptcy court's decision to approve a settlement must be an informed one based upon an objective evaluation of developed facts.  Indeed, a bankruptcy judge cannot accept the proponent's word that the settlement is reasonable, nor may the judge merely rubber stamp a proposal."  In re Andre Chreky, Inc., 448 B.R. 596, 609 (D.D.C. 2011) (quoting Advantage Healthplan, Inc. v. Potter, 391 B.R. 521, 554 (D.D.C. 2008)).  To determine whether a settlement is "fair and equitable," "'the bankruptcy court should consider: (1) probability of success in the litigation; (2) difficulties, if any, with collection, (3) the complexity of the litigation, including the expense, inconvenience, and delay attendant to the litigation; and (4) the interest of creditors.'"  Id. (quoting

Advantage Healthplan, 391 B.R. at 554).  "In determining the reasonableness of a settlement, a

bankruptcy judge must decide only whether the settlement falls between the lowest and highest

points in the range of reasonableness."  Id. (citing In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.

1983)).

The bankruptcy court found that Yelverton likely owned one-fourth of Yelverton Farms, not

one-third as he had claimed.  Bankruptcy Proceeding Dkt. 546 at 216:19–218:7.  The court reached

this conclusion because Yelverton offered no evidence to dispute that a valid issuance of stock by

the company—to which he had not objected—had diluted his ownership share.  Id.  The bankruptcy

court next found that the Trustee properly valued the company at $400,000 or less because it did not

own the land on which it operated, its lease was set to expire in a year, and its value to a new owner

was limited by whatever terms Edmundson might offer to renew the lease.  Id. at 218:25–221:12.

The bankruptcy court next found that Yelverton's claim for back rent against Yelverton Farms was

barred by the statute of limitations, his malicious interference with a prospective contract claim was

not supported by evidence and would be very costly to litigate, and he had no facts to support his

claim for a distribution of corporate profits.  Id. at 223:1–225:22.  It also rejected Yelverton's

argument that he had control over the company's production contract with Maxwell Foods, Inc.

because: (1) the contract is assigned to Yelverton Farms as profits are paid to the company, not

Yelverton; (2) the settlement did not dispose of the estate's ownership of the contract, whatever it

might be; and (3) the contract was valueless because nothing prevented Maxwell Foods from

canceling the contract and creating a new one with Yelverton Farms directly.  Id. at 225:23–227:12.

The bankruptcy court further accepted the Trustee's determination, along with that of retained

North Carolina counsel, that litigation would be expensive and success would be uncertain, at best.

Id. at 227:13–230:12.  Finally, the bankruptcy court found that the Trustee did not need to secure a

formal appraisal of Yelverton Farms because the settlement was premised on the upward ceiling of

any expected appraisal.  Id. at 230:13–20.  These findings were made after an extensive, day-long evidentiary hearing and were supported by substantial record evidence.  Based on these findings, this Court concludes that the bankruptcy court did not abuse its discretion in approving the settlement agreement.  The bankruptcy court correctly applied the legal standard and relied on factual findings that were properly supported by record evidence.

Yelverton argues that the Trustee was compromised "and thereby was unable to exercise independent judgment to protect the interest of the Creditors" because the Trustee was "forced into being substituted for Yelverton as the plaintiff" in the North Carolina litigation while the bankruptcy estate lacked funds to litigate the case.  Appellant's Br. at 22–23, Yelverton I. Yelverton cites to cases holding that a bankruptcy trustee cannot have a personal interest in the bankruptcy estate, e.g., Mosser v. Darrow, 341 U.S. 267, 271 (1951), but the cashflow of the bankruptcy estate has nothing to do with whether the Trustee was self-interested in the settlement. Yelverton provides no evidence to indicate any self-interest.  Moreover, it was perfectly within the Trustee's business judgment to compare the cost of litigating Yelverton's claims to their likelihood of success in determining whether to settle.

Yelverton further claims that Edmundson and Marm fraudulently represented to the bankruptcy court that Yelverton had previously transferred his stock in Yelverton Farms to an associate, Wade H. Atkinson, and that the Trustee relied on these representations in valuing Yelverton's claims.  Appellant's Br. at 24–26, Yelverton I.[3]  But the Trustee did not base his valuation on this assumption.  At the settlement hearing, Yelverton asked the Trustee whether he relied on the argument that Atkinson owned the stock, and the Trustee replied "Mr. Yelverton, I

---

[3] Yelverton also argues that the settlement must be invalidated because the Trustee believed the stock was Atkinson's, yet had no authority to control the disposition of Atkinson's property.  Id. at 26.  This claim is obviously without merit, as Yelverton himself represents that the stock was his, not Atkinson's, and thus is the property of the bankruptcy estate.

have never thought that there was a dispute that you did not own stock in Yelverton Farms and the defendants have never taken the position that you did not own stock in Yelverton farms." Bankruptcy Proceeding Dkt. 546 at 159:11–14.  Moreover, the Court has reviewed Edmundson and Marm's filings in the bankruptcy proceeding, and they do not assert that Atkinson owned this stock. Yelverton continues to make this meritless claim in an assortment of filings with this Court and others, but there is no support for it.  See Opinion and Order, Yelverton III, Dkt. 19 (Aug. 6, 2014) (issuing a pre-filing injunction against Yelverton and detailing his extensive history of asserting this and other meritless claims).

Yelverton next argues that Edmundson and Marm breached their fiduciary duties as majority stock holders in Yelverton Farms by entering into the settlement because they falsely claimed that Atkinson owned Yelverton's stock and told the Trustee that they would decline to renew the lease on Yelverton Farms.  Appellant's Br. at 26–28, Yelverton I.  This argument fails for at least three reasons.  First, Yelverton provides no legal support for the proposition that a breach of a fiduciary duty by a party to an otherwise valid settlement would invalidate the settlement. Second, as discussed above, Edmundson and Marm did not in fact make any false assertions regarding Atkinson's ownership of the stock.  Third, the Trustee's valuation was not based on the assumption that Edmundson and Marm would decline to renew the lease.  It was based simply on the acknowledged fact that Yelverton Farms is worth considerably less than Yelverton maintained because it does not own the underlying land, and its lease would soon expire.

Yelverton similarly argues that equitable estoppel prevents this settlement because Edmundson and Marm previously represented that they would work for the benefit of Yelverton Farms, yet now maintain that they will not renew the lease on the underlying land.  Appellant's Br. at 28–29, Yelverton I.  Equitable estoppel precludes a party from "contradicting testimony or pleadings successfully maintained in a prior judicial proceeding. . . . The party seeking to invoke

the estoppel, however, must have been an adverse party in the prior proceeding, must have acted in reliance upon his opponent's prior position, and must now face injury if a court were to permit his opponent to change positions." Konstantinidis v. Chen, 626 F.2d 933, 937 (D.C. Cir. 1980) (citations omitted).  Yelverton asserts that he acted in detrimental reliance on Edmundson's and Marm's affidavits in the Eastern District of North Carolina litigation where they swore they would preserve the corporate assets of Yelverton Farms.  But Yelverton does not identify any acts that he took in reliance on those statements; he asserts only that he "reasonably believed" they would not damage the value of his stock.  Appellant's Br. at 29, Yelverton I.  Additionally, failing to promise to renew the company's lease at equivalent terms does not contradict Edmundson and Marm's prior statements, which say nothing about Edmundson's lease of her privately-owned land to the company.

Yelverton next posits that the Trustee failed to submit an appraisal as required by D.C. Local Bankruptcy Rule 6004-1, which provides that notice of the private sale of estate property must include an appraisal or scheduled valuation.  Rule 6004-1 is not applicable, however, because the Trustee did not engage in a private sale of property; rather he negotiated the settlement of claims owned by the bankruptcy estate.  Regardless, to the extent any notice requirement existed, the Court finds that there is good cause to suspend it pursuant to Local Bankruptcy Rule 9029-1.  The Trustee found, and bankruptcy court agreed, that a formal appraisal was not appropriate because its cost would outweigh its benefit.  A scheduled valuation was also unwarranted because the settlement value was based on a global settlement of all litigation claims that incorporated the litigation judgments of the Trustee and North Carolina counsel.

Yelverton makes a series of additional arguments, which the Court will address in turn. *First*, he contends that the settlement agreement failed to take into account the value of the production contract with Maxwell Foods, Inc., and the Trustee did not explain how the contract was

taken into account.  Appellant's Br. at 29–30, <u>Yelverton I</u>.  The bankruptcy court found, however, that the settlement agreement does not dispose of the bankruptcy estate's interest in the contract, so this issue is immaterial.  Moreover, the bankruptcy court determined that the contract was valueless.

*Second*,  Yelverton argues that the settlement denies him a "fresh start" after bankruptcy because it undervalues his litigation claims and because the Trustee was compromised.  Appellant's Br. at 30–31, <u>Yelverton I</u>.  This argument simply repackages arguments that the Court has rejected above.

*Third*, Yelverton contends that the settlement harms the legal rights of his ex-wife, Senyi de Nagy-Unyom, because she and Yelverton owned his stock in Yelverton Farms as tenants by the entireties.  Appellant's Br. at 31–34, <u>Yelverton I</u>.  But the bankruptcy court, the D.C. Superior Court, and now this Court, as explained below, have all found that Yelverton did not hold the stock as a tenant by the entirety.  Yelverton lacks authority to assert Senyi de Nagy-Unyom's legal rights in any event.

*Fourth*, Yelverton argues that the settlement improperly dismisses his claims in Adversary Proceeding No 10-10004—in which he sought to prevent Marm and her husband from selling a tract of land—although the Trustee has not been substituted as a party in that case.  Appellant's Br. at 31–34, <u>Yelverton I</u>.  This is not a justification for invalidating the settlement, however. Yelverton provides no support for his argument that a procedural defect or an overly broad settlement is void *ab initio*; this is not the law.  Moreover, the Trustee need not substitute himself as a party in this case before the claims become property of the bankruptcy estate.

Lastly, Yelverton asserts that the Trustee must abandon the claims because he is "giving only nominal or no value to these litigation claims[.]"  Appellant's Br. at 35, <u>Yelverton I</u>.  Under the relevant statute, a Trustee can abandon property that is burdensome to the estate or is of inconsequential value.  11 U.S.C. § 554.  The Trustee was able to acquire $110,000 for the bankruptcy estate in exchange for Yelverton's stock and a global settlement of all litigation claims. While Yelverton maintained at the settlement approval hearing, and reasserts before this Court, that

the Trustee is treating his litigation claims as valueless, this is not so.  He simply took a less

optimistic view of the likely of success of some of Yelverton's litigation claims than Yelverton did.

      B.  <u>Yelverton II</u>

<u>Yelverton II</u> concerns Yelverton's claimed exemptions of his stock in Yelverton Farms as

property held as tenants by the entireties, under the wildcard exemption,[4] and as a claim for lost

future earnings.  A debtor may amend his claimed exemptions without requesting approval of the

bankruptcy court at any time before the case is closed.  Fed. R. Bankr. P. 1009.  The party opposing

the exemption has the burden to prove that the exemption is improper.  Fed. R. Bankr. P. 4003(c).

Under 11 U.S.C. § 522(b)(1), a debtor must elect to claim exemptions under either subsection

522(b)(3) or 522(d), but not both.  Yelverton filed claims under both subsections, stating that he

was doing so in the alternative.  The bankruptcy court permitted him to do so and, after determining

the validity of each of his claimed exemptions, selected the exemption scheme that provided the

largest exemptions, which was subsection 522(d).  Bankruptcy Proceeding Dkt. 587 at 10–11.  This

Court will review the bankruptcy court's determinations as to each of Yelverton's claimed

exemptions.

      Under 11 U.S.C. § 522(b)(3)(B), a debtor may exempt from bankruptcy any interest in

property held as a tenant by the entirety.  In the proceedings below, Yelverton and the Trustee

disagreed over whether to apply North Carolina or District of Columbia law regarding property held

as tenants by the entireties, but the bankruptcy court concluded that the result would be the same

under either.  Bankruptcy Proceeding Dkt. 587 at 13.  Under North Carolina law, personal property

cannot be property held as tenants by the entireties in any circumstance.  <u>Lovell v. Rowan Mut. Fire</u>

<u>Ins. Co.</u>, 274 S.E.2d 170, 174 (N.C. 1981) ("an estate by the entirety in personal property is not

---

[4] The wildcard exemption permits a debtor to exempt a statutorily specified dollar amount from the bankruptcy estate.  <u>See</u> 11 U.S.C. § 522(d)(5);

recognized in North Carolina") (citing <u>Bowling v. Bowling</u>, 91 S.E.2d 176, 180 (N.C. 1956)).

Thus, Yelverton's stock and related litigation claims cannot be held by tenants by the entireties if

North Carolina law applies.

Under D.C. law, property of a married couple may be held as tenants by the entireties if the

four common law unities of interest are present: "unity of time, title, interest and possession."

<u>Daniel v. Wright</u>, 352 F. Supp. 1, 3 & nn.5–6 (D.D.C. 1972).  "That is to say, the interests must be

identical, they must accrue by the same conveyance, they must commence at the same time and the

estate must be held by the same undivided possession."  <u>Harrington v. Emmerman</u>, 186 F.2d 757,

760 n.8 (D.C. Cir. 1950).  The only interest Senyi de Nagy-Unyom arguably may have acquired in

the stock was through a writing from Yelverton in 2008, which promises to give her $100,000 from

the sale of his stock.  The four unities are not present here because: (1) the interest are not identical,

under the writing as Senyi de Nagy-Unyom only acquired a right to proceeds from the sale of the

stock, while Yelverton maintained an ownership interest; (2) Senyi de Nagy-Unyom acquired her

interest by a separate conveyance than Yelverton; and (3) Yelverton acquired his interest in

Yelverton Farms, and thus the legal claims that arose from his ownership of that stock, well before

his conveyance to Senyi de Nagy-Unyom.  Thus, the stock is clearly not property held as tenants by

the entireties.

A debtor filing a claim prior to April 1, 2010 may exempt up to $11,200 from his interest in

property that is part of the bankruptcy estate.  11 U.S.C. § 522(d)(5); <u>see</u> 75 Fed. Reg. 8747 (Feb.

25, 2010).  A debtor may not exempt property under this exemption, only a capped dollar amount

from the debtor's interest in the property.  <u>Schwab v. Reilly</u>, 560 U.S. 770, 782 (2010) ("a debtor

may 'clai[m] as exempt' as the debtor's 'interest'—up to a specified dollar amount—in the assets

described in the category, not as the assets themselves").  The bankruptcy court permitted Yelverton

to claim $11,200 from the proceeds of the settlement agreement.  This is precisely what subsection 522(d)(5) permits.

A debtor may also exempt litigation claims as compensation for lost future earnings.  11 U.S.C. § 522(d)(11)(E).  The bankruptcy court denied this exemption without prejudice because Yelverton did not specifically describe the property claimed as exempt.  Bankruptcy Proceeding Dkt. 587 at 19–20 (citing among other cases In re Bell, 179 B.R. 129, 131 (Bankr. E.D. Wis. 1995)).  Yelverton had not specified which of his litigation claims sought compensation for lost future earnings or the value of those claims.  Accordingly, the bankruptcy court properly denied his claim of exemption under section 522(d)(11)(E).

Yelverton argues that this appeal must be remanded because, after the bankruptcy court granted summary judgment against him regarding these exemptions, he filed an additional claim for an exemption of his stock, again under the exemption for claims of lost future earnings.  Appellant's Br. at 9, Yelverton II.  This request is moot, however, because the bankruptcy court has found that Yelverton's claims are not for lost future earnings.  Bankruptcy Proceeding Dkt. 790.  Remand is also unnecessary because Yelverton II deals with the discrete issues of whether his stock may be exempted as property held as tenants by the entireties or under the wild card exemption.  As a result, the Court will deny Yelverton's motion to remand.

Yelverton further contends that the bankruptcy court may only deny a claim of an exemption if it finds that the debtor claims the exemption in bad faith or if the exemption would prejudice the creditors.  Appellant's Br. at 10–12, Yelverton II.  This is simply incorrect as a matter of law.  A debtor may not *amend* his *claimed* exemptions, even if timely, if he does so in bad faith or to prejudice creditors, e.g., In re Michael, 163 F.3d 526, 529 (9th Cir. 1998), but Yelverton was permitted to amend his claimed exemptions.  A debtor may never exempt property that falls outside the statutorily permitted exemptions no matter if done in good faith.

Yelverton next argues that because his stock and litigation claims are exempt property, the settlement agreement is retroactively void.  Appellant's Br. at 10–12, Yelverton II.  This puts the cart before the horse, however, as both the bankruptcy court and this Court have determined that the stock and litigation claims were not properly exempted.  Moreover, Yelverton provides no support for his contention that a later amendment to his claims of exempt property retroactively voids an otherwise valid settlement agreement.

Lastly, Yelverton argues that the bankruptcy court erroneously denied his application to proceed in forma pauperis.  Appellant's Br. at 13–14, Yelverton II.  This Court has already determined that Yelverton must pay for his many appeals of the bankruptcy court's orders because he is an abusive filer.  See Memorandum Opinion and Order, In re Yelverton, 13-74, Dkts. 10, 11 (D.D.C. Nov. 12, 2013).  The reasoning of that opinion applies equally to the denial of his in forma pauperis application in this case and the Court adopts it in affirming the bankruptcy court's order here.

### C.  Yelverton III

Yelverton's third appeal targets bankruptcy court orders denying reconsideration of the order approving the settlement between the Trustee, Edmundson, Marm, and Yelverton Farms. While the Court will address the merits of Yelverton's arguments in this appeal, he may not continue to move, ad infinitum, to reconsider each bankruptcy court order with which he disagrees. Further frivolous appeals of this kind may warrant sanctions beyond the restrictions the Court is issuing in a pre-filing injunction in this case contemporaneously with this opinion.  See Opinion and Order, Yelverton III, Dkt. 19 (Aug. 6, 2014).

Yelverton argues that the settlement between the Trustee and Marm was procured by fraud on the bankruptcy court, which warrants relief under Federal Rule of Civil Procedure 60(b)(3).  As evidence of this supposed fraud, Yelverton points to an email in which the Trustee stated "[w]hy

don't I ask the family to agree that the pig farm lease will not be renewed as part of the settlement

and if it is renewed I reserve the right to reevaluate Mr. Yelverton's share of the business."

Appellant's Br. at 18–19 & Ex. 2, <u>Yelverton III</u>.[5]   Yelverton's argument is baseless.  This email in

no way demonstrates, as Yelverton contends, that there was a conspiracy between the Trustee,

Edmundson, Marm, their counsel, and a former U.S. Trustee for South Carolina to diminish the

value of Yelverton's bankruptcy estate.  Yelverton's motion is untimely in any event under Federal

Rule of Civil Procedure 60(c)(1), which requires that a motion under Rule 60(b)(3) must be made

"no more than a year after the entry of the judgment or order[.]"  The bankruptcy court approved

the settlement on June 19, 2012 and Yelverton did not file his second motion for relief from that

order—wherein he first raised this argument—until July 14, 2013.

Yelverton next argues that the order approving the settlement agreement is void for lack of

subject matter jurisdiction because the settlement involves the stock in Yelverton Farms, which is

marital property.  Appellant's Br. at 22–23, <u>Yelverton III</u>.  The bankruptcy court and this Court

have already determined that the stock is not held as tenants by the entireties with Senyi de Nagy-

Unyom.  <u>See</u> <u>infra</u>.  More importantly, whether or not the settlement is valid, the bankruptcy court

has jurisdiction over whether to approve it.  Fed. R. Bankr. P. 9019(a).  Yelverton's argument that

the contents of the settlement somehow affect the court's jurisdiction is patently wrong.

Finally, Yelverton argues that the order approving the settlement violated due process

because he was denied an opportunity to be heard and because the decision was "based on factual

assertions that were not subject to cross-examination[.]"  Appellant's Br. at 23, <u>Yelverton III</u>

(emphasis omitted).  The order approving the settlement was made after a full-day evidentiary

hearing that complied with any conceivable notion of due process.  Having reviewed the transcript

---

[5] Yelverton also reasserts his argument that Marm fraudulently represented that Atkinson owned Yelverton's stock in Yelverton Farms.  Appellant's Br. at 20, <u>Yelverton III</u>.  That issue has already been disposed of above.

of that proceeding, the Court is satisfied that Yelverton was provided a full opportunity to present his case and cross-examine witnesses.

### IV.    Conclusion

For the reasons stated above, the following orders of the bankruptcy court will be affirmed: Order Granting Motion to Approve Settlement Agreement, Dkt. 477; Order Denying Amended Motion to Compel Trustee to Abandon Litigation Claims, Dkt. 505; Order Denying Motion to Vacate Order Approving Settlement, Dkt. 507; Order re Cross Motions for Summary Judgment Regarding Objection to Exemptions, Dkt. 588; Memorandum Decision and Order re Motion for Leave to Submit Supplemental Filings, Dkt 589; Memorandum Decision and Order Denying Motion to Alter or Amend Decision, Dkt. 597; Memorandum Decision and Order Denying Motion to Vacate Order Denying Leave to Pursue Appeal in District Court Without Prepaying Fees or Costs, Dkt. 613; Order Denying Second Motion to Vacate Order Approving Settlement, Dkt. 682; Order Denying Motion to Vacate Order Denying Motion for Relief from Judgment, Dkt. 696; and Order Denying Motion to Vacate Memorandum Decision, Dkt. 704.  The Court will issue an order consistent with this memorandum opinion.

 

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:    _____August 6, 2014_____